GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-24-01040-PHX-ROS |
|---|---|
| Plaintiff, | **UNITED STATES' MOTION FOR DETENTION** |
| v. | |
| 1.  Alexandra Gehrke, a/k/a "Lexie" Gehrke, and | |
| 2.  Jeffrey King, | |
| Defendants. | |

The United States respectfully seeks the pretrial detention of defendants Alexandra Gehrke, a/k/a "Lexie" Gehrke ("GEHRKE") and Jeffrey King ("KING") as they pose a significant risk of flight based on the nature of the charges, the strength of the evidence,

their access to substantial financial resources and a private airplane, the severity of the penalties faced, evidence demonstrating their preparation and intent to flee, and their lies, omissions, and misrepresentations to Pretrial Services.

## PROCEDURAL HISTORY

On June 17, 2024, a criminal complaint was filed charging GEHRKE and KING with one count of conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349). That evening, law enforcement arrested GEHRKE and KING at the Phoenix Sky Harbor International Airport as they boarded a flight to London, England.

On June 18, 2024, GEHRKE and KING were indicted for conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. §§ 1347 and 2), conspiracy to defraud the United States and to pay and receive kickbacks (18 U.S.C. § 371), solicitation and receipt of kickbacks (42 U.S.C. §§ 1320a-7b(b) and 18 U.S.C. § 2), and transactional money laundering (18 U.S.C. §§ 1957 and 2). [ECF No. 6.] The Indictment also seeks forfeiture of assets belonging to GEHRKE and KING, including two residences; four luxury vehicles; over $500,000 of gold bars, gold coins, and jewelry; over $52 million held in 11 bank accounts; and two $8,000,000 life insurance policies. *Id.* at 18–20.

The indictment alleges that GEHRKE and KING orchestrated a massive scheme to defraud Medicare by targeting elderly patients, many of whom were terminally ill in hospice case, and causing medically unnecessary and highly expensive amniotic wound dressings ("allografts") to be applied to these vulnerable patients. *Id.* at 2. From November 2022 through May 2024, GEHRKE, KING, and their co-conspirators, individually and through companies they owned and controlled, caused more than $900 million in false and fraudulent claims to Medicare for these medically unnecessary allografts applied to less than 500 patients. *Id.* at 2–3. Medicare and other health care benefits programs paid over $600 million based on these false and fraudulent claims. *Id.* at 3. GEHRKE and KING received over $330 million in unlawful kickbacks as a result of their fraud scheme. *Id.*

**LEGAL STANDARD**

The Bail Reform Act ("BRA") provides that a defendant should be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required . . . ." 18 U.S.C. § 3142(e)(1). This analysis involves a "two-step inquiry." *United States v. Gentry*, 455 F. Supp. 2d 1018, 1019–20 (D. Ariz. 2006). *Id.* First, the Court must make a finding as to whether the defendant presents a "serious risk that such person will flee" if not detained. *Id.* at 1020 (quoting 18 U.S.C. § 3142(f)(2)). The government bears the burden of proving such risk of flight by a preponderance of the evidence. *Id.* Second, if the defendant is likely to flee, the Court next must determine whether any condition or combination of conditions for the defendant's release will reasonably assure the appearance of the defendant. 18 U.S.C. § 3142(f).

The BRA provides the following four factors for courts to consider when determining whether to detain a defendant: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, which includes, among other things, the defendant's financial resources, past conduct, and history related to drug abuse; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release. 18 U.S.C. § 3142(g).

**ARGUMENT**

GEHRKE and KING present serious risks of flight, and there is no condition or combination of conditions of release that can reasonably assure their appearance as required.

**I.    The Nature and Circumstances of the Charged Offenses Favor Detention.**

The severity of the offenses charged, the possible punishment if convicted, and the nature of the Defendants' complex fraud conspiracy favor detention.

GEHRKE faces eight charges, and KING faces seven charges, in the ten-count Indictment. Count 1 charges both Defendants with an offense that has a maximum penalty of 20 years. GEHRKE faces a combined statutory maximum penalty of 85

years, and KING faces a combined statutory maximum penalty of 75 years. With a loss of over $900 million in billed claims to the defrauded health care benefit programs and several likely additional enhancements, including sophisticated means and role adjustments, the Advisory Guidelines range under the U.S. Sentencing Guidelines is a life sentence for both Defendants.

The offenses charged are extremely serious, involving the application of highly expensive allografts to vulnerable and dying patients for the purpose of stealing money entrusted for the elderly and disabled. Health care fraud is a serious crime that Congress has long condemned as contrary to the public interest and a threat to the viability of Medicare.[1] The Ninth Circuit has also recognized that the seriousness of charges and severity of penalties give a defendant an incentive to flee. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.").

Furthermore, the Defendants are charged with crimes involving a complex web of lies and deceit. Over the course of nearly two years, the Defendants defrauded health care benefit programs by causing the submission of over $900 million in false and fraudulent claims to Medicare, CHAMPVA, TRICARE, and commercial insurance companies. [ECF 6 at 12.] In addition to these numerous false claims submitted month after month, GEHRKE made false certifications to Medicare as her company's authorized official. *Id.* at 9. The Defendants also concealed and disguised the illegal kickbacks they received by, among other ways, causing sham invoices to be issued. *Id.* at 12. The deceitful nature of the offenses charged favor detention because it makes it

---

[1] H.R. 95-393, pt. II, at 44 (1977) ("In whatever form it is found, . . . fraud in these health care financing programs adversely affects all Americans.  It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program.  It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.").

1  less likely that the Defendants will abide by any conditions of release ordered by the
2  Court.

3      Thus, because the Defendants face a *de facto* life sentence if convicted of the
4  serious offenses charged, they have a compelling incentive to flee if released, and the
5  nature of the offenses against them make it less likely that they can be trusted to abide
6  by any conditions of release. For these reasons, the Defendants should be detained.

7  **II.   The Weight of the Evidence Favors Detention.**

8      The Government's case against GEHRKE and KING is very strong.

9      The evidence against the Defendants includes statements from multiple
10  cooperating witnesses, audio and video recordings, internal company documents, text
11  messages, emails, bank and financial records that show health insurance
12  reimbursements flowing to a web of bank accounts controlled by the Defendants,
13  Medicare records, other health insurance company records, medical records and
14  patient files, statements from patients' health care providers and caretakers, and other
15  documents and witness statements. The Government collected this evidence over the
16  course of a thorough investigation that lasted several months and involved the
17  execution of multiple search warrants.

18      Some of this evidence is highlighted in the Indictment itself. As described in
19  paragraph 29(j), GEHRKE directed sales representatives to order 4x6cm allografts for
20  wounds the "size of [her] little fingernail." This is because the larger the allograft, the
21  more Medicare paid, and the more money the Defendants received. This alone is
22  compelling evidence establishing GEHRKE's criminal intent. Similarly, as noted in
23  paragraph 29(h) of the Indictment, KING sanctioned the application of extremely
24  expensive allografts to any wound of any severity regardless of medical necessity by
25  instructing the sales representatives to refer Medicare patients for grafting who had
26  wounds "of any stage" that would "benefit from healing faster."

27      The strength of the evidence against GEHRKE and KING is underscored by the
28  fact that two nurse practitioners who contracted with companies owned and controlled

by GEHRKE and KING agreed to plead guilty to health care fraud and wire fraud conspiracies for their roles in the Defendants' scheme.

In sum, the evidence gathered in this thorough and lengthy investigation by the Federal Bureau of Investigation, the Department of Health and Human Services – Office of Inspector General, the Department of Veterans Affairs, and the Department of Defense amply supports the Indictment's allegations and the need for the Defendants' continued detention.

## III. The History and Characteristics of the Defendants Favor Detention

The amount of money accumulated by the Defendants, their access to substantial funds and a friend's airplane, specific evidence demonstrating preparation and intent to flee, and the Defendants' lies, omissions, and misrepresentations to Pretrial Services strongly favor detention.

### A. GEHRKE and KING Have Significant Assets.

Bank records reflect that GEHRKE and KING opened savings, checking, brokerage, and trust accounts at numerous banks under their own names and the names of limited liability companies, through which hundreds of millions of dollars flowed over the past year and a half. The records also show that GEHRKE recently moved significant funds into newly opened accounts under the names of LLCs in an apparent attempt to conceal the money, and that KING withdrew millions of dollars on April 26, 2024. The Government seized only approximately $60 million in total of these funds. Thus, it is believed that the Defendants likely have access to potentially tens of millions of dollars that they could use to flee and live comfortably in hiding in the United States or abroad if released.

During the conspiracy, GEHRKE owned and controlled accounts held in at least eight different financial institutions under her name and the names of at least six different LLCs. Bank records showed that GEHRKE opened accounts as recently as May 2024, into which she moved substantial amounts of money. For example, between May 14-15, 2024, GEHRKE wired over $30 million from accounts in her name and

one of her business entities, AMTG Medical Consultant LLC, into accounts opened on May 3, 2024, in the names of AMTG Medical Consultant LLC and Jexie Enterprises Inc. The lack of a legitimate financial purpose in moving money in this manner suggests that these transfers were intended to conceal the assets.

During the conspiracy, KING owned and controlled bank accounts held in at least five different financial institutions under his own name and the names of at least four different LLCs. Bank records show that on April 26, 2024, KING withdrew over $6.7 million from various accounts, and the Government is aware that KING has access to at least an additional $4.5 million in his name of which the Government has yet to seize. Therefore, there is reason to believe that KING currently personally has access to over $11 million, in addition to shared assets with his spouse, GEHRKE.

The Government believes that the Defendants likely have access to significant fraud proceeds, possibly tens of millions of dollars, that the Government has yet to trace and seize due to the Defendants' efforts to move, conceal, and disguise the money. If released, the Defendants could access this money and use it to flee and live comfortably as fugitives.

**B.      GEHRKE and KING Knew Criminal Charges Were Imminent and Were Prepared to Flee Once Charged.**

Items recovered from GEHRKE and KING's residence, luggage, and safe deposit boxes establish that they were aware criminal charges were imminent and were prepared to flee.

**1.      Upon Leaving the Country, GEHRKE Instructed Her Housekeeper to Notify Her of an Indictment.**

On June 18, 2024, law enforcement executed a search warrant at GEHRKE and KING's residence in Scottsdale, Arizona. Among the items seized by law enforcement was a notebook containing GEHRKE's handwritten notes. The notes indicate that if GEHRKE and KING had not been arrested at the airport, they would have traveled throughout Europe for 36 days:



Another note appeared to be directed to the housekeeper, with instructions to give the pet sitter a house key, door code, and garage code. At the bottom of that note, GEHRKE wrote "please notify of indeitment [*sic*] or any further harsher legal escalations immediately."

This note reflects GEHRKE's belief that she could be indicted during her trip to Europe and her desire to be notified immediately when it happened.

**2.** **GEHRKE and KING Owned a Book Titled "How To Disappear."**

During the search of GEHRKE and KING's residence, law enforcement recovered a book titled: *How To Disappear: Erase Your Digital Footprint, Leave False Trails, and Vanish Without a Trace*:



Amazon's description of this book indicates that it is "written by the world's leading experts on finding people and helping people avoid being found" and that the book "covers everything from tools for disappearing to discovering and eliminating the nearly invisible tracks and clues we tend to leave wherever we go." *See* https://www.amazon.com/How-Disappear-Digital-Footprint-Without/dp/1599219778.

While the mere ownership of this book would not necessarily be indicative of an actual intent to disappear in most circumstances, it certainly raises a red flag here in light of GEHRKE and KING's concerns with an impending indictment and efforts to conceal their fraudulent proceeds.

### 3. In Their Carry-On Luggage, GEHRKE and KING had a Criminal Law Handbook and Three Cellular Phones.

Law enforcement seized GEHRKE and KING's luggage incident to arrest. An inventory search of their carry-on bags revealed that they contained three cellular phones. GEHRKE and KING also had an additional cellular phone on each of their persons when arrested. In total, GEHRKE and KING possessed five cellular phones between them as they boarded the international flight, enabling them to communicate with each other and others through multiple devices.

Additionally, one of the carry-on bags contained a book titled *Criminal Law Handbook: Know Your Rights, Survive The System*:



This is not the type of book ordinarily brought on a 36-day European vacation, nor a book that a non-lawyer without legal exposure would ordinarily have. And when viewed in conjunction with GEHRKE's written instructions to the housekeeper and the *How To Disappear* book recovered from the residence, it is further evidence of GEHRKE and KING's acknowledgment that criminal charges were looming when they decided to leave the country.

**4.      GEHRKE Left Instructions On How to Access and Transfer Cryptocurrency to Her in Her Physical Absence.**

Bank records show that GEHRKE and KING both purchased cryptocurrency. On June 18, 2024, law enforcement executed search warrants on three safe deposit boxes rented by GEHRKE and KING. The Defendants added certain relatives and one close friend as "additional clients" to these safe deposit boxes, so others had could access the boxes in their absence. Inside one of those safe deposit boxes was a black USB drive, a purple USB drive, a cryptocurrency Ledger-Nano-S-Plus (the "Ledger"), and a "secret recovery sheet" booklet:

 

The Ledger is a secure digital wallet accessible with a PIN that stores passcodes ("private keys") needed to access and manage cryptocurrency stored in crypto wallets. *See* https://www.ledger.com. To operate the Ledger, it needs to be connected to a smartphone or laptop where its companion software can be installed. *Id*. This allows cryptocurrency transactions to be completed via the internet. *Id*.

1    Along with the Ledger and flash drives were instructions, handwritten by

2    GEHRKE, about how to access the cryptocurrency in her physical absence once she

3    gave verbal authorization:



The notes state as follows:

> Lexie[']s verbal authorization req[uired] to access. Instructions. Only
> use if Lexie authorizes verbally by saying "I colored my hair and it came
> out [color of ledger <u>black</u> or <u>purple</u>]."[2] Then only disclose the words for
> the appropriate color. NOT BOTH. Some words are only 4 letters.
> That[']s ok. Use the metal etchings. Thank you! I love you. Lexie
> Gehrke.

---

[2] This appears to reference the black and purple USB devices in the photograph above.

There was also a booklet labeled "crypto seed bank" depicted in the above photo. "Seed phrases" are strings of 12, 18, or 24 words used to generate the private keys, which enable access to the cryptocurrency wallet.

Taken together, these items and instructions suggest that GEHRKE and KING were prepared to flee in the event of an indictment and have their cryptocurrency transferred to them by having a relative or close friend with access to the safe deposit boxes provide the seed phrases after GEHRKE used code language ("I colored my hair").

### 5.   Large Amounts of Cash Were Recovered from GEHRKE and KING's Residence and Safe Deposit Boxes.

Law enforcement recovered over $350,000 in cash from GEHRKE and KING's home and safe deposit boxes on June 18, 2024, when executing search warrants. The Defendants are not known to have operated in any legitimate cash-intensive businesses. This large amount of cash could easily have been used to flee and live comfortably without leaving traces from credit cards and bank transfers.




**6.   GEHRKE's Friend Owns a Plane and Had Access to GEHRKE and KING's Safe Deposit Boxes Containing Fraudulent Proceeds and the Cryptocurrency Transfer Instructions.**

GEHRKE's close friend, who gave a speech at GEHRKE and KING's February 2024 wedding, received over $3 million from GEHRKE during the course of the fraud conspiracy purportedly for this friend's work as a sales representative. This friend used a portion of the funds to purchase an airplane. GEHRKE and the friend are depicted here, at the Scottsdale Airport, posing with the plane:

 

Bank records show that on June 3, 2024, GEHRKE wrote a $9,000 check to this friend's company with "air travel expense" written in the memo line. This is also the same friend who had access to GEHRKE and KING's safe deposit boxes, including the safe deposit box that contained the cryptocurrency, cryptocurrency instructions detailed above, and approximately $250,000 in cash.

Unlike taking flights from a commercial airport, passengers on privately-owned planes do not undergo security checks or purchase boarding passes. Accordingly, it would be impossible for law enforcement to stop GEHRKE or KING from boarding their friend's plane and fleeing the United States. If granted bond, the evidence suggests that GEHRKE

and KING could use this friend's plane to abscond from the jurisdiction and evade prosecution.

### C.     GEHRKE and KING Lied to Pretrial Services.

GEHRKE and KING were interviewed by the U.S. Department of Probation ("Probation") prior to their initial appearances. Those Pretrial Services Reports ("PSR") contain material lies, omissions, and misrepresentations concerning GEHRKE and KING's finances and assets, GEHRKE's drug usage, and their foreign travel. The demonstrative dishonesty in their self-reporting to Probation is further evidence that GEHRKE and KING cannot be trusted to follow this Court's directives and return to court as required.

***Finances and Assets.*** GEHRKE reported to Pretrial Services that her estimated net worth totaled $17 million, $10 million of which was held in her personal checking account, and $7 million that was held her business account. *See* GEHRKE PSR at 3. On June 18, 2024, law enforcement seized over $52 million from GEHRKE's personal and business accounts the day after GEHRKE's arrest and an $8 million life insurance annuity policy. Even limiting GEHRKE's misrepresentation to the money seized by the Government, GEHRKE identified less than 30% of her actual net worth. GEHRKE also failed to disclose ownership of three luxury vehicles worth almost $900,000 combined—a 2022 Mercedes G63 worth over $360,000, a 2016 Ferrari worth over $300,000, and a 2023 Mercedes GLE worth over $230,000.

KING similarly underreported his net worth to Pretrial Services. KING reported that he had $2.1 million in stocks/bonds, $10,000 in cash, and approximtely $257,000 in his savings and retirement accounts. *See* KING PSR at 3. These figures are inaccurate. Bank records show that KING withdrew close to $7 million on April 26, 2024, from accounts he owned and controlled. And that amount doesn't include the additional $4.5 million in his brokerage accounts or his $8 million life insurance annuity policy, the latter of which was seized by law enforcement. KING also undervalued his 2023 Mercedes GLE "business vehicle," claiming it was worth $60,000 when bank records show he personally purchased it for $90,000 in August 2023.

***Drug Usage.*** GEHRKE also lied about her drug usage. Several hours after initially declining to submit to a urinalysis to Pretrial Services, GEHRKE submitted a sample that tested positive for amphetamine and methamphetamine. Despite the positive test, GEHRKE denied using methamphetamine. These positive results and GEHRKE's denial are concerning both with respect to GEHRKE's mental and physical health as factors to be considered when assessing the propriety of pretrial detention, and because they demonstrates GEHRKE's willingness to lie to a federal agency.

***Foreign Travel***. GEHRKE and KING both reported that their last foreign travel was to the Bahamas for leisure in February/March 2024. This is also inaccurate. While they did travel to the Bahamas in early March 2024, records show that on March 31, 2024, GEHRKE and KING travelled to Mexico by vehicle.

Even after their arrest, GEHRKE and KING continued their deception by outright lying, omitting, and misrepresenting information to Pretrial Services concerning their finances, drug usage, and foreign travel. The Defendants' inability to be honest with a federal agency after their arrests provides reason to believe that they will not follow the orders and directives of this Court.

## **CONCLUSION**

There is not just a preponderance, but substantial evidence that GEHRKE and KING pose significant risks of flight and that there is no condition or combination of conditions that can reasonably assure their return to court. GEHRKE and KING are charged with multiple, serious offenses, for which there is abundant evidence supporting their guilt and lengthy potential prison sentences if convicted. Moreover, between the Defendants' recent financial activity, GEHRKE's handwritten note to the housekeeper, and their possession of criminal law and how-to-disappear books, the evidence plainly shows that GEHRKE and KING were aware that criminal charges were imminent and made preparations to flee. Those preparations included asking their housekeeper to inform them of an indictment while they were abroad and creating written instructions on how to access and transfer their cryptocurrency. GEHRKE and KING also have access to millions of dollars and a friend's

private plane that could be used to flee and live comfortably as fugitives. Finally, GEHRKE and KING lied to Pretrial Services and therefore cannot be trusted to comply with this Court's directives.

Accordingly, pursuant to 18 U.S.C. § 3142, the Government urges the Court to continue to detain GEHRKE and KING pending trial and deny their motion for release.

Respectfully submitted,

,

GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
District of Arizona

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By:   */s/ Shane Butland*
SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

Dated: June 24, 2024

- 17 -