TIMOTHY COURCHAINE
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-24-01040-PHX-ROS |
| Plaintiff, | **UNITED STATES' MEMORANDUM IN AID OF SENTENCING** |
| v. | |
| Alexandra Gehrke, a/k/a "Lexie" Gehrke, | |
| Defendant. | |

The United States submits this Memorandum in Aid of Sentencing pertaining to defendant Alexandra Gehrke, a/k/a "Lexie" Gehrke ("Gehrke"). Gehrke not only executed the largest health care fraud scheme in the history of Arizona, depriving the Medicare Trust Fund of hundreds of millions of dollars that would have otherwise been used to fund needed

medical care for the elderly and disabled, but she did so by targeting the most vulnerable population—dying seniors in hospice care—because, in her words, that was "where the most money [was] at." [ECF No. 6 at 10].

The Department of Probation ("Probation") recommends a sentence of 186 months' imprisonment. *See* Pre-Sentence Investigation Report ("PSR"), Section II. For the reasons explained below, a more significant sentence is warranted to reflect the seriousness of Gehrke's conduct, promote respect for the law, and provide adequate deterrence.

## I.   PROCEDURAL BACKGROUND

On June 18, 2024, a federal grand jury returned a 10-count indictment charging Gehrke and co-defendant Jeffrey King ("King") with conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. §§ 1347 and 2), conspiracy to defraud the United States and to pay and receive kickbacks (18 U.S.C. § 371), solicitation and receipt of kickbacks (42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 2), and transactional money laundering (18 U.S.C. §§ 1957 and 2). [ECF No. 6].

On October 24, 2024, Gehrke pleaded guilty to Count 1 of the Indictment—conspiracy to commit health care fraud and wire fraud. [ECF No. 116].

## II.   GEHRKE'S OFFENSE CONDUCT

Gehrke coordinated and carried out one of the most financially impactful health care fraud schemes in American history. The staggering loss amount—over $1.2 billion in intended loss and over $614 million in actual loss—has little precedent of which the government is aware, and her scheme resulted in the first prosecution in the country involving fraudulent Medicare claims for amniotic wound allografts.

Gehrke set up companies to facilitate her illegal referrals, wooed co-conspirators with promises of immediate riches, and devised a business model that rewarded greed at the expense of patient care.

Her scheme involved a calculated multi-step process:
- Gehrke, through her companies Apex Medical LLC ("Apex") and Viking Medical Consultants LLC (d/b/a Viking Medical Marketing LLC) ("Viking"),

- 2 -

- contracted with medically untrained salespeople to locate Medicare patients with wounds of any size or severity.
- Gehrke trained and financially incentivized these medically untrained salespeople to order as large and as many allografts as possible to be placed on those wounds.
- Gehrke instructed the salespeople to refer those patients to her own company—Apex Mobile Medical LLC ("Apex Mobile Medical")—and a company co-owned by King, her fiancé (and later in the conspiracy, her husband) and co-defendant—APX Mobile Medical LLC ("APX"). Apex Mobile Medical and APX were enrolled with Medicare and contracted with nurse practitioners to apply the allografts ordered by Apex and Viking's salespeople.
- Gehrke and King directed and occasionally pressured the nurse practitioners to suspend their own medical judgment and apply whatever allografts were ordered, regardless of whether they were medically necessary.
- Gehrke and King received illegal kickbacks from the wholesale distributor of the allografts ("Company 1") based on the number of allografts that Apex Mobile Medical and APX ordered and billed to Medicare.

**A. Gehrke Used Apex and Viking to Locate Medicare Beneficiaries**

Gehrke was the co-owner and CEO of Apex and the sole owner of Viking, companies that she incorporated in 2021 and 2023, respectively. Apex and Viking contracted with medically untrained "sales representatives"—the majority of whom were hired from the solar panel sales industry—to locate Medicare beneficiaries with wounds. Gehrke assigned the sales representatives to geographic areas within Arizona where they were instructed to use Google Maps to find facilities with elderly populations, such as nursing homes and (especially) hospice facilities, where Medicare coverage and patient wounds were likely to be abundant. Gehrke and King falsely told the sales representatives that any and all wounds could be allografted with the highly expensive allografts distributed by Company 1. Because Medicare paid per square

centimeter for these allografts, Gehrke directed the sales representatives to order the largest sizes of allografts available, even for small and unserious wounds.

### B. Gehrke Engaged in Self-Dealing and Financially Incentivized the Sales Representatives to Order Numerous Allografts

In an extraordinary display of self-dealing, from November 2022 through April 2023, Gehrke referred the patients identified by the sales representatives of her marketing company to her allografting company—Apex Mobile Medical—which billed Medicare for the allografts applied to the patients. Recognizing that this business arrangement would undoubtedly raise the eyebrows of regulators and law enforcement, Apex Mobile Medical operated (and billed Medicare) under a different name—APX—beginning in April 2023. The only difference between the two was that Gehrke's then-fiancé replaced her as the company's co-owner. This reorganization had two primary benefits: it created the illusion of independence between the marketing entity (Apex) and the medical practice (APX) while allowing Gehrke to maintain operational control of both; and, with her future husband at the helm of APX, it enabled Gehrke to continue profiting from both entities.

Gehrke financially incentivized Apex's sales representatives to find and refer as many Medicare patients as possible to Apex Mobile Medical and APX by paying them "commissions"—*i.e.*, illegal kickbacks based on the size and quantity of the allografts that they ordered, or arranged for or recommended to be ordered, for the patients. This financial arrangement resulted in kickback payments to sales representatives as high as $12,500 for a single application of allografts to a single patient. At least twelve sales representatives received over $1 million in less than a year and four received over $5 million each. This payment structure was also self-serving, as Gehrke received her own "commissions" from Company 1 based on the volume of allografts that Company 1 sold to Apex Mobile Medical and APX to be applied to the patients identified and referred by Gehrke's sales representatives.

### C. Nurse Practitioners Were Directed to Only Apply Allografts to the Patients Referred by Apex's Sales Representatives

Gehrke, through Apex Mobile Medical, and King, through APX, contracted with nurse practitioners to apply Company 1's allografts to the Medicare beneficiaries identified and referred by Apex's sales representatives, and paid the nurse practitioners between $500 and $1,000 each time they applied allografts to a patient.

Gehrke made clear to Apex Mobile Medical's nurse practitioners that their job was not to exercise independent medical judgment, coordinate a treatment plan in conjunction with the patients' treating physicians, or even review the patients' medical records, but merely to apply whatever allografts were ordered by the sales representatives to whatever wounds the sales representatives deemed worthy of these extraordinarily expensive products. King issued similar edicts at Gehrke's behest once she installed him as APX's co-owner.

The financial incentive for Apex sales representatives to order large numbers and sizes of allografts—and the lesser but significant financial incentive for the contracting nurse practitioners to schedule as many appointments as possible—combined with Apex Mobile Medical and APX's policy requiring nurse practitioners to apply all allografts ordered led to remarkably unsurprising results: numerous allografts were ordered and applied to single wounds, unreasonably large allografts were ordered and applied to very small wounds, and in some instances, allografts were ordered and applied to purported wounds that did not even exist.

In the five months between November 2022 and April 2023, Apex Mobile Medical billed Medicare over $34 million for wound allografts that it purchased from Company 1, and Medicare paid over $20 million based on those false and fraudulent claims. In the next ten months, between April 2023 and February 2024, APX billed Medicare over $884 million for allografts that it purchased from Company 1, and Medicare paid over $574 million based on those false and fraudulent claims.

To demonstrate the egregiousness of these billing practices, Medicare claims data reflects that APX billed over $16 million for allografts applied to a single patient, APX billed over $1 million for allografts applied to another 272 patients, and APX submitted claims for allografts applied to 7 patients on the dates of their death.

### D. Gehrke Unlawfully Enriched Herself with Fraudulent Proceeds

Between June 2022 and May 2024, Gehrke received, individually and through Apex Mobile Medical, Apex, and Viking, approximately $279,912,916 in illegal kickbacks from Company 1 in exchange for purchasing, ordering, and arranging for and recommending the ordering of its allografts. Gehrke used a portion of this money to pay kickbacks to her sales representatives and diverted the remainder—over $110 million—to her own personal accounts. Once her owner's take was secured, Gehrke became a regular at Louis Vuitton, purchased a $5.8 million dollar home, and drove a $360,000 Mercedes G-Wagon; she and King bought over $600,000 worth of precious metals, jewelry, and watches; and she made financial arrangements in the event she was caught, buying two $8 million life insurance policies, meeting with a Swiss banker at the Phoenix Sky Harbor airport to discuss transferring money to overseas bank accounts, and leaving passwords and instructions for accessing and transferring her cryptocurrency in safe deposit boxes accessible by her best friend and mother.

### III.    SENTENCING GUIDELINES

Probation calculated Gehrke's offense level as follows:

- Gehrke's conduct qualifies for a base offense level of 7, U.S.S.G. § 2B1.1(a)(1);
- 30 levels are added based on a loss of more than $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P);
- 2 levels are added because the offense involved ten or more victims, U.S.S.G. § 2B1.1(b)(2)(A)(i);

- 4 levels are added because Gehrke was convicted of a health care offense involving a loss of more than $20 million to a government health care program, U.S.S.G. § 2B1.1(b)(7);
- 2 levels are added because Gehrke used sophisticated means, U.S.S.G. § 2B1.1(b)(10)(C);
- 4 levels are added based on Gehrke's role as an organizer and leader of a criminal activity that involved five or more participants or was otherwise extensive, U.S.S.G. § 3B1.1(a);
- 2 levels are added because Gehrke abused a position of trust, U.S.S.G. § 3B1.3;
- 2 levels are added because Gehrke willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice, U.S.S.G. § 3C1.1;
- 2 levels are deducted based on Gehrke's acceptance of responsibility, U.S.S.G. § 3E1.1(a); and
- 1 level is deducted based on Gehrke's timely notification of her intention to plead guilty, U.S.S.G. § 3E1.1(b).

PSR ¶¶ 50–59. Though the resulting offense level is 50, the offense level is treated as 43 pursuant to Chapter 5, Part A (comment n.2). *Id*. ¶ 59. Combined with a criminal history category I, Probation calculated Gehrke's Guidelines range to be life imprisonment. *Id*. ¶ 96.

The United States agrees with Probation's determination that the offense conduct supports each of the guidelines applied; however, the United States does not seek the application of the 2-level enhancement for obstruction of justice nor the 2-level enhancement for ten or more victims, as the government did not recommend

those enhancements in Gehrke's plea agreement and believes it would be unfair to now advocate for harsher guidelines than what was agreed upon.[1] *See* ECF No. 118.

Gehrke did not object to Probation's application of any of the Guidelines.

## IV.   SENTENCING FACTORS

The factors set forth in 18 U.S.C. § 3553(a) support a significant term of incarceration greater than that recommended by Probation.

**A. The Need to Reflect the Seriousness of Gehrke's Offense, Promote Respect for the Law, and Provide Just Punishment Support a Lengthy Term of Imprisonment**

The sentence imposed should reflect the serious nature and circumstances of Gehrke's offense, promote respect for the law, and provide just punishment. A variance to the extent requested by Probation would not adequately serve these purposes.

A grand jury indicted Gehrke for eight felony counts that carried a combined statutory maximum of 85 years' imprisonment. And yet, the severity of that cumulative statutory maximum sentence is exceeded by the Guidelines range of life imprisonment on her guilty plea to Count 1. That the combined statutory maximums for each indicted count results in a lower sentencing exposure than the Guidelines range not only demonstrates the severity of Gehrke's conduct but elucidates why the government seeks a sentence exceeding Probation's recommendation. Gehrke's total offense level was quite literally off the Guidelines sentencing chart; a *7-level* reduction was required pursuant to Chapter 5, Section A (n.2) to bring the adjusted offense level down to a 43, the highest possible offense level listed in the Guidelines sentencing table.

Gehrke not only enriched herself by committing fraud, but she did so by bilking a federal health care program funded by American taxpayers that is relied upon by tens of millions of elderly and disabled Americans for valuable health care benefits. Every

---

[1] Whether these enhancements apply does not affect the Guidelines range of life imprisonment.

dollar Gehrke caused to be diverted from this program—to herself and her co-conspirators—is a dollar that could and should have been used to provide legitimate, vital, medically necessary services to populations whose vulnerability prompted the creation of the very program that Gehrke and her co-conspirators so brazenly took advantage of.

### B. The Need to Afford Adequate Deterrence Disfavors a Variance

#### 1. *General Deterrence of Medicare Fraud*

Gehrke's punishment should take into account not only the scope and seriousness of her criminal conduct, but also the need for general deterrence of future criminals from stealing from Medicare. The Ninth Circuit Court of Appeals has noted that "[f]raud crimes . . . typically are calculated, and, as a result, are particularly amenable to general deterrence." *United States v. Thompson*, 130 F.4th 1158, 1167 (9th Cir. 2025) (citing the court's recognition in *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) of "the increased importance of general deterrence in white collar crime cases"). Sentencing Gehrke to a lengthy term of imprisonment will send a clear message that Medicare fraud is a serious offense and violating criminal fraud laws has serious consequences.

#### 2. *Specific Deterrence of Wound Allograft Fraud*

Gehrke's punishment should reflect the need to deter similar offenders. The extraordinary expense of amniotic wound allografts combined with the number of Medicare beneficiaries with wounds, the illegal financial incentives offered by allograft distributors, and the willingness of medical facilities to outsource their patients' wound care create fertile ground for fraudsters to make immense profits by taking advantage of the trust-based nature of the Medicare system. Gehrke and her co-conspirators stole over $590 million from Medicare in less than two years by billing for allografts applied to less than 500 Medicare beneficiaries concentrated almost entirely in one state. There are similar wound allograft schemes operating around the country, including ones across state lines, that have collectively siphoned an

extraordinary amount of taxpayer dollars from Medicare and other federal health care programs.

Gehrke's sentence should send a clear message to everyone involved in wound allograft fraud that seeking riches by defrauding Medicare instead of providing legitimate medical services does not pay.

3.   *Individual Deterrence for Gehrke*

Gehrke's sentence should also reflect the need to protect the public from Gehrke's future crimes. This case did not involve an isolated error of judgment nor a brief stint of fraudulent behavior. Gehrke committed fraud week after week, and month after month, for almost two years.

By December 2023, Gehrke had accumulated more money than most could spend in a lifetime. And yet, her insatiable greed caused her to rebrand Apex as Viking, open a series of new bank accounts at a series of financial institutions, and continue business as usual. It took two Medicare audits, J.P. Morgan Chase's termination of her relationship as a client based on suspicious transactions, and Medicare's suspension of over $87 million in reimbursements before Gehrke finally relinquished control of the operation. But even after she purportedly separated from Viking in May 2024, there was an agreement in place for her to receive 10% of Viking's proceeds until 2025. *See* PSR ¶ 84.

A lengthy prison term will send a message to Gehrke that there are significant consequences for not only committing Medicare fraud on such a historic scale but brazenly persisting in that fraudulent conduct.

**C. Gehrke's History and Characteristics Do Not Support a Variance**

Nothing about Gehrke's personal history or characteristics warrants a downward departure or variance from her Guidelines range for this serious, prolonged, and unprecedentedly egregious fraud offense.

Gehrke had a pleasant childhood: Gehrke reports that she was an only child raised by both parents and enjoyed a childhood free from abuse, neglect, and serious family conflict. PSR ¶ 69–70.

Her parents were successful and involved: Gehrke reports that her father was an attorney who owned a law practice in Scottsdale and her mother, with whom she has maintained a close relationship, was a homemaker. *Id*. ¶ 68–69.

Gehrke had educational opportunity: she graduated high school one year early and spent a year at Front Range Community College in Colorado before enrolling at the Fashion Institute of Design and Merchandizing in Los Angeles, which she attended for two years. *Id*. ¶ 81-82.

And she supported herself financially: Gehrke had extensive employment history in medical sales and earned $7,000 per month prior to her arrest managing a building that she owned. *Id*. ¶ 83–93.

But despite abundant family support, healthy surroundings, educational opportunities, ownership of real property, and gainful and lawful employment earning over $80,000 per year, Gehrke opted to take a different path. Unlike many defendants who commit federal felonies, Gehrke had every advantage and every opportunity to live a comfortable and law-abiding life. Instead, she used her intelligence and savvy to unlawfully enrich herself at the expense of others.

**D. The Need to Avoid Unwarranted Sentencing Disparities Supports a Lengthy Prison Sentence**

The Guidelines intended to establish sentencing uniformity whereby similarly situated defendants received similar sentences. *United States v. Banuelos-Rodriguez*, 215 F.3d 969, 974 (9th Cir. 2000) ("In drafting the Guidelines, the [Sentencing] Commission 'sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.'" (citing U.S.S.G. Ch. 1, Pt. A, Intro, p.s. 3, at 2)); *Rita v. United States*, 551 U.S. 338, 349 (2007).

Though the outrageous amount of money involved in Gehrke's scheme puts it in a class of its own, other defendants in the pantheon of costly health care fraud schemes involving fraudulent Medicare billing for medically unnecessary items and services received lengthy prison sentences:

| Defendant | Case No. | District | Approx. Loss | Offenses of Conviction | Sentence |
|---|---|---|---|---|---|
| Matthew Ligotti | 20-CR-80092 | SDFL | $746 million | 18 U.S.C. § 1349 | 240 months |
| Wade A. Walters | 19-CR-00051 | SDMS | $170 million | 18 U.S.C. § 1349<br>18 U.S.C. § 1956h | 216 months |
| John Cruise | 18-CR-344 | SDTX | $125 million | 18 U.S.C. § 1349 | 240 months |
| Rafael Arias | 17-CR-20509 | SDFL | $66 million | 18 U.S.C. § 1349 | 240 months |
| Christopher Iruke | 09-CR-01008 | CDCA | $12 million | 18 U.S.C. § 1349<br>18 U.S.C. § 1347 | 180 months |

Other than Iruke, each of the above defendants pleaded guilty. There are numerous prison sentences just as lengthy and even lengthier for health care fraud defendants who were convicted at trial.

The above cases demonstrate that a sentence much greater than that recommended by Probation is both consistent with sentences imposed in other jurisdictions for the same or similar offenses and appropriate given the comparative egregiousness of the loss amount at issue here.

**E. Gehrke Should be Ordered to Pay Restitution to Her Victims**

Gehrke did not commit a victimless crime, and restitution to the victims is mandatory. The victims of Gehrke's offense are Medicare, TRICARE, CHAMPVA, and commercial insurers. Consistent with the recommendation of Probation, Gehrke should be ordered to pay $614,945,420.01, which is the actual loss for her offense, jointly and severally with her co-conspirators.

## V. CONCLUSION

Based on the considerations set forth above, the United States respectfully requests that the Court sentence to a significant term of imprisonment; impose a 3-year

term of supervised release; and order Gehrke to pay 614,945,420.01 in restitution, jointly and severally with her co-conspirators.

,

Respectfully submitted,

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
District of Arizona

LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By: */s/ Shane Butland*
SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

Dated: August 4, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*
Daniel Parke
U.S. Attorney's Office