Joshua Sabert Lowther, Esq.
Ga. Bar # 460398
Admitted *Pro Hac Vice*
Lowther | Walker LLC
101 Marietta St., NW, Ste. 3650
Atlanta, GA 30303
O 404.406.4052 | F 866.819.7859
jlowther@lowtherwalker.com
www.lowtherwalker.com

Attorney for Defendant
Alexandra Gehrke

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | 2:24-CR-001040-ROS-1 |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT ALEXANDRA GEHRKE'S SENTENCING MEMORANDUM AND INCORPORATED MOTION FOR DOWNWARD VARIANCE** |
| Alexandra Gehrke, *et al.*, | |
| Defendants. | |

Ms. ALEXANDRA GEHRKE, pursuant to Fed. R. Crim. P. 32(i)(1)(C), respectfully submits the following position regarding sentencing.

**I.     Statutory Penalties**

This Court shall consider "the kinds of sentences available." 18 U.S.C. § 3553(a)(3).

Ms. Gehrke pled guilty to one count of conspiracy to commit health-care fraud and wire fraud in violation of 18 U.S.C. §§ 1349, 1347, and 1343. PSR, ¶¶ 1–2. This offense is a Class C felony, punishable by a term of imprisonment of not more than twenty years; a fine in the amount of $250,000, or twice the pecuniary gain or loss resulting from the offense; and a term of supervised release of not more than three years. 18 U.S.C. §§ 1349, 1347, 1343, and 3583.

This offense is not punishable by any mandatory minimum term of imprisonment.

**II.     Sentencing Guidelines**

This Court "shall consider . . . the kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines . . . ."  18 U.S.C. § 3553(a)(4)(A).

The parties have stipulated to a sentencing guidelines calculation for this Court's consideration (Plea Agm't 3–4, ECF No. 118), with which the probation officer concurs (PSR, ¶¶ 3, 49–59).  The parties and the probation officer agree that the sentencing guidelines sentence is 240 months of imprisonment (PSR, ¶ 96; U.S.S.G. § 5G1.1(a)), and that a sentence below that sentencing guidelines sentence, for various reasons, is warranted (PSR, Sent'g Rec. 29–30).

Ms. Gehrke submits that a sentence of 120 months of imprisonment is "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]."  18 U.S.C. § 3553(a).

**III.    18 U.S.C. § 3553**

This Court, "in determining the particular sentence to be imposed, shall consider" (18 U.S.C. § 3553(a)), *inter alia*, the following factors:

    **a.     Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))**

Ms. Gehrke has struggled with mental health, disability, and substance-abuse issues for her entire life.  *See* PSR, ¶¶ 74–80; Letter from Dr. Elliot L. Atkins to Joshua Sabert Lowther, Esq. (July 14, 2025) (pending submission).  These issues—although not excuses for the criminal conduct to which she "thoroughly" (PSR, ¶ 48) and without reservation has admitted—affected her judgment and exacerbated her then-penchant for making poor (and often self-destructive) decisions before and during the eighteen-month duration of the subject conspiracy.

### 1.     Mental Health and Disability

Ms. Gehrke's struggles with mental health and disability began during her childhood. Her undiagnosed Autism Spectrum Disorder (ASD), which she suffered along with Attention-Deficit Disorder (ADD), severe anxiety, and depression, colored her interactions with her family and peers. Atkins, Letter at 2.

Ms. Gehrke's ASD symptoms first appeared in preschool, where she showed extreme aversions to persons who were in her presence, and anxiety based on her perceived lack of control of her environment. *Id.* She also had severe aversions to touch, including any physical affection from her parents, which contributed to her mother and father's confusion at the time. *Id.*; *see also* Letter from Ms. Lisa Schuldes to Hon. Roslyn O. Silver (undated) (pending submission). Ms. Gehrke had significant difficulty relating to her peers during this time, a trend that continued throughout her childhood. Atkins, Letter at 1. Her unusual reactions to sensory stimulation and inability to understand personal relationships with others exacerbated her being bullied and suffering social isolation (Atkins, Letter at 2), both common occurrences for children with disabilities. Lilly Augustine *et al.*, *The Role of Disability in the Relationship Between Mental Health and Bullying: A Focused, Systematic Review of Longitudinal Studies,* 55 Child Psychiatry & Human Dev., 893, 893–908 (2024).

Ms. Gehrke's father's actions did not alleviate her childhood struggles: although he provided for her and her mother financially, he showed little patience with Ms. Gehrke and spent very little of his time with her. Atkins, Letter at 3. He often remarked that he never wanted children. *Id.* at 4. Ms. Gehrke's mother exerted her best efforts to help Ms. Gehrke emotionally, but ultimately misunderstood Ms. Gehrke's emotional needs and the actual extent of Ms. Gehrke's mental anguish that resulted from her undiagnosed disability. *See generally* Atkins, Letter.

Ms. Gehrke felt like a disappointment to her parents and peers, and did not receive proper support for her disability. These factors understandably lead her to develop severely-low self-esteem, anxiety, and depression. Atkins, Letter at 4–10.

### 2. Addiction

Ms. Gehrke used alcohol and controlled substances in an effort to cope with her emotional suffering, beginning at the age of fourteen, and continuing through a date shortly before her arrest and detention in the instant case. PSR, ¶¶ 76–79.

Ms. Gehrke began consuming alcohol at the age of fourteen and developed a dependency on it that resulted in an apparent negative impact on her life at the age of twenty-eight. PSR, ¶ 76. She enrolled in an inpatient, alcohol-rehabilitation program in 2016, and upon her discharge from that facility twenty-seven days later, she attended Alcoholics Anonymous meetings until 2019. *Id.* She has been able to abstain from consuming alcohol since 2022. *Id.*

Ms. Gehrke began using cocaine at the age of seventeen. PSR, ¶ 78. She abused the drug heavily until the age of nineteen, and then intermittently until she achieved sobriety from it in 2016, coinciding with her aforementioned sobriety from alcohol. *Id.* However, she was unable to maintain sobriety from cocaine, relapsing in 2019. *Id.* With the exception of her having attended a seven-day detoxification program in 2021, she continued to use the drug to varying degrees (but for substantial periods of time, daily) until a short time before her arrest, resulting in an inability to obtain the drug. *Id.*

A person's use of cocaine has well-documented, negative impacts on that person's ability to function cognitively. Specifically, prolonged cocaine abuse most seriously impacts the cognitive domains controlling attention, impulsivity, verbal learning, verbal memory, and working memory. Stéphane

4

Potvin, *et al.*, *Cocaine and Cognition: A Systematic Quantitative Review*, 8 J. of Addiction Med. 368, 369 (2014).  A person's cocaine abuse also impairs executive functioning, which is a set of mental processes related to directing that person's behavior, adjusting goals based on new information, suppressing impulses, and delaying gratification.  Charles A. Dackis, *et al.*, *Cocaine Dependence: A Disease of the Brain's Reward Centers*, 21 J. of Substance Abuse Treatment 111, 112–4 (2001).  Cocaine abuse also can impact a person's assessment of risk and reward.  Caitlin A. Orsini, *et al. Distinct Relationships Between Risky Decision Making and Cocaine Self-Administration Under Short – and Long – Access Conditions*, 30 Progress in Neuropsychological Biology Psych. 98 (2019).

Ms. Gehrke, while emphasizing again that she makes no excuses for her criminal conduct, submits that her prolonged drug abuse impacted her ability to assess risks, and to plan her actions according to those risks, thereby contributing—at least in part—to her unwillingness to terminate (or even avoid) that conduct.  She is confident, based on her now-specific awareness of the need to address her mental health and drug addiction issues meaningfully and to maintain her mental health and sobriety, that she will be able to conduct herself in a law-abiding manner in the future.

  **b.** **Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))**

Criminologists have shown, empirically, that harsher sentences do not deter the public from committing crimes, generally; rather, the certainty of being prosecuted for those crimes has a more significant deterrent effect. Charles E. Loeffler & Daniel S. Nagin, *The Impact of Incarceration on Recidivism*, 5 Ann. Rev. of Crim., 133–152 (2022).  Ms. Gehrke's having been charged, arrested, and convicted will be the greatest deterrent in this case to prospective criminals, not the length or severity of her sentence. *Id.*  Therefore, Ms. Gehrke

submits that this Court's imposing a sentence, *inter alia*, of a term of imprisonment of 120 months will suffice for general deterrence.

### c. Need to Protect the Public from Ms. Gehrke's Future Criminal Conduct (18 U.S.C. § 3553(a)(2)(C))

Ms. Gehrke is thirty-nine years of age (PSR at 3) and has a criminal history score of zero (PSR, ¶ 62.) A defendant's age and criminal history, together, are strong predictors of recidivism. If this Court imposes a term of imprisonment of 120 months, Mr. Gehrke will be forty-eight years of age upon her release from prison. Offenders who are between forty and forty-nine years of age, with a criminal history category of I, had recidivism rates of only 22.3%. *See* Ryan Cotter, *et al.*, U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010*, 30 (2021). Furthermore, among all federal offenders released in 2010, only 4% were re-arrested for fraud charges. Kim Steven Hunt & Robert Dumville, U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, 17.

Ms. Gehrke is educated, and she performed well in school. PSR, ¶ 81. Offenders with relatively higher educations are subject to lower recidivism rates; while offenders who did not graduate from high school are subject to recidivism rates of 60%, offenders with a college degree are subject to recidivism rates of only 19%. Kim Steven Hunt & Robert Dumville, U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, 24 (2016).

There is insufficient data to suggest that even a sentence of 120 months of imprisonment would be necessary for Ms. Gehrke not to recidivate. Charles R. Breyer, *et al.*, U.S. Sent'g Comm'n, *Length of Incarceration on Recidivism*, 18 (2022). A comparison of two groups of offenders with similar ratios of offense characteristics, gender, race, and age, who were sentenced to 120 months of imprisonment or more, showed that those offenders had recidivism rates only

marginally lower than those who were sentenced to less than 120 months of imprisonment. *Id.* However, 81.6% of the compared offenders were sentenced for drug crimes; 8.7% were sentenced for robberies; 6.8% were sentenced for firearm-related crimes; and 2.8% were sentenced for "other" crimes. *Id.* Therefore, sentences of 120 months of imprisonment or more only slightly decreased recidivism rates for drug crimes, robberies, and firearm offenses in comparison with sentences of less than 120 months of imprisonment. *Id.* Those measured characteristics, however, are inapplicable to Ms. Gehrke; insufficient data exists to demonstrate that a sentence of more than 120 months of imprisonment is necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2)(C) and to protect the public from any future criminal conduct by Ms. Gehrke. Statistically, she is unlikely to commit a future crime, and a sentence of 120 months of imprisonment will suffice for specific deterrence.

### d. Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2))

Ms. Gehrke, regardless of the length of the term of imprisonment that this Court imposes, will experience lifelong consequences from her having been convicted of a federal felony offense.

#### 1. Seriousness of the Offense

Federal offenders face severe socioeconomic consequences from incarceration. On average, people who served sentences of imprisonment experienced a 52% percent decrease in subsequent annual earnings. Terry-Ann Craigie, *et al.*, N.Y.U. Brennan Center for Justice, *Conviction, Imprisonment, and Lost Earnings: How Involvement with the Criminal Justice System Deepens Inequality,* 7 (2020). Therefore, should this Court sentence Ms. Gehrke to even less than 120 months of imprisonment, particularly with the forthcoming restitution obligation, Ms. Gehrke will suffer lifelong financial consequences, which certainly will reflect the seriousness of this offense.

### 2. Respect for the Law and Just Punishment

This Court's sentencing Ms. Gehrke to 120 months of imprisonment would also be sufficient to promote respect for the law and provide just punishment. Ms. Gehrke submits that no future review or consideration of this sentence, in conjunction with the collateral consequences of her permanently suffering a felony conviction, the loss of her livelihood in the medical-sales industry, and the irreparable damage to her reputation that she has and will continue to suffer as a direct result of her criminal conduct, will leave any member of the public with the impression that the benefit of committing a similar crime (there is none) will outweigh its consequences.

### e. Substance Abuse and Mental Health Treatment or Vocational Training (18 U.S.C. § 3553(a)(2)(D))

Ms. Gehrke, based on her history of substance abuse (PSR, 76–79), submits that she will benefit from participation in the Federal Bureau of Prisons' Residential Drug Abuse Program, and requests that this Court include that recommendation in its judgment.

### f. Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))

Federal courts sentenced 446 defendants in health-care fraud cases in Fiscal Year 2023: 32.4% were women; 40.9% were white; 89.9% were United States citizens; and 89.5% had little or no criminal history. U.S. Sent'g Comm'n, *Quickfacts: Healthcare Fraud* (2023). Those offenders' base offense levels were increased as follows: 35.1% for loss to a federal health care benefit program of more than $1 million; 17.2% for using sophisticated means; 26.6% for abuse of a position of public or private trust; and 22.1% for a leadership role. *Id.* Therefore, Ms. Gehrke is similar to the average health-care-fraud offender, both demographically and in relation to the sentencing guidelines specific-offense characteristics and adjustments applicable to her case.

Although 73.6% of those offenders were sentenced to terms of imprisonment, only 19.47% of them were sentenced within the applicable sentencing guidelines ranges: 34.65% received a downward departure, and 44.78% received a downward variance. *Id.* The average sentence reduction for those offenders who received a sentence below the sentencing guideline range was 55.36%, and the average sentence reduction for those offenders who substantially assisted the Government in the investigation or prosecution of another person was 69.5%. *Id.* Ms. Gehrke therefore submits that this Court's sentencing her substantially below the sentencing guidelines sentence is necessary to avoid unwarranted sentencing disparities.

**IV.   Recommended Designation**

Ms. Gehrke requests that this Court recommend to the Federal Bureau of Prisons that she be designated to Federal Correctional Institution Phoenix's minimum-security satellite camp, based on its close proximity to her immediate family.

**V.   Conclusion**

Ms. Gehrke, based on the foregoing assertions and argument, prays that this Court sentence her to a term of imprisonment of 120 months, to a term of supervised release of three years, to pay restitution in the amount of $614,945,420.01, and to pay a special assessment in the amount of $100.

Date:   August 4, 2025

Respectfully submitted,

*s/ Joshua Sabert Lowther*
Joshua Sabert Lowther, Esq.